Peck, J.,
delivered t_ e opinion of the court:
Simon Stevens represents that in the month of August, A. D. 1861, he sold to the United States five thousand Hall’s carbines, at the price of twenty-two dollars each, and the appendages accompanying said carbines, together with the boxes in which they were packed, for the sum of three thousand six hundred and ninety-five dollars, the whole of which were shortly afterwards accepted by the United States and used in the military service.
He also represents that this sale was made to Major General John 0. Frémont, by correspondence through the medium of the telegraph, he offering the carbines for sale, and the general accepting the proposition, directing that the carbines should be sent by express, not as fast freight, saying he would pay all extra charges ,• also requesting that *99 ammunition should be sent — admonishing Stevens to devote himself solely that day to the business of the transaction.
The guns were known as smooth bores, and Stevens had made arrangements to have them rifled; hut General Frémont having telegraphed to him to “ hurry up guns,” Stevens answered that he could send the guns at once as smooth bore, at one dollar per gun less, hut that if they should he rifled it would be ten days before the first lot would go forward; upon the receipt of this information, General Fré-mont replied that Stevens had “ done right; go on with the rifling ; use despatch ; hurry up.”
By an arrangement between Stevens and one J. Pierpont Morgan 'the voucher for the first two thousand and five hundred carbines delivered was to he made out in the name of said Morgan, which was done; the said voucher was signed by “ F. D. Callender, captain of ordnance, United States army,” and was for the sum of 155,550. By fur■ther arrangement this voucher went into the hands of Messrs. Ketch-um, Son & Co. The above voucher was afterwards, on or about the 10th of September, 1861, fully paid and satisfied.
The remainder of the carbines, two thousand five hundred in number, with the appendages and packing-boxes for the five thousand carbines, were received by General Fremont and distributed to his troops some time prior to the 26th of September, A. D. 1861, and for these, on that day, a voucher was given for the sum of $58,175, signed by “ F.D. Callender, captain of ordnance, United States army,” certifying that “ the annexed named ordnance stores have been received in good order.” This voucher was, soon after its date, presented for payment, but was not paid, by reason of a request made to the War Department by the chairman of a committee of Congress that payment of demands connected with the business of the western military department should be suspended while or until that committee should investigate the management of affairs in that department. Afterwards, on the 13th of March, 1862, the Secretary of War appointed a commission, consisting of the honorable Joseph Holt and Robert Dale Owen, to audit and adjust all contracts, orders,, and claims, in respect to ordnance, arms, &c., in said department. On the 12th of June afterwards these commissioners made a report on this claim, and directed that the sum of about eleven thousand dollars and interest should be paid on the voucher, in full of all demands against the United States in connection with this affair. Neither Messrs. Ketchum. Son & Co. nor this claimant did or would accept anything or sum in satisfaction of the vouchers other than the full sum expressed on its face.
*100 The petition sets forth that G-eneral Frémont was vested by the authority of the President of the United States with full power, right, and authority, as the military commander of the Western Department, to make all needful supplies for the use of the troops under his command, of every kind whatever, in pursuance of which authority he purchased these carbines and appendages, and that the United States are held ,and bound by his acts, and by the purchase made in this behalf. The claimant demands fifty-eight thousand one hundred and seyenty-five dollars.
The material averments of the petition are supported by proof; and the claimants should recover a judgment, unless the solicitors have interposed valid objections or adduced countervailing evidence.
The defence is, first, that Major General Frémont had not, in virtue of his office as military commander of a department, authority to make the special contract upon which this suit is instituted, and that such a contract can be made only by the Ordnance Department; second, that General Frémont did not derive authority to make the contract from any instructions or orders issued to him by the President, ■at or subsequent to the time of his assignment to the said command ; ■and, third, that the claimant has' already been paid as much for the arms as they were reasonably worth.
The first and second objections may be considered together. It may be true, as the assistant solicitor urges, that a contract like this belonged properly to the Ordnance Department, and had that depart-1 meat been prepared to furnish the necessary arms, upon a requisition for them from General Frémont, his action in the premises might not now receive approval. Apart from the routine of discipline and army regulations, the presumption might well be that a general in command of a department, who is directed to organize an army with which to suppress a serious rebellion then in arms, would have authority, if the means for the purpose were not otherwise provided, to procure them when and as he could, by purchase or otherwise. The omission to do so would doubtless bring upon him something more serious than reproach. It may well be said that the bargain made by General Fremont was not more unusual than the times which begat it; and much may be overlooked in an omission to regard forms, if we reflect upon the urgency of the occasion.
It may be that General Frémont did not make a formal demand upon the ordnance officers for arms; but that was not a fact which this claimant was bound to inquire into. He had a right to suppose that an officer holding the rank that General Frémont, did, had observed all *101 the forms and conformed to the regulations in that regard. The claimant has, nevertheless, obviated this objection, by proving that such an application, had it been made, would have been unavailing, since there were not any arms at the disposal of the Ordnance Department which could be sent him. The omission to make the requisition is excused, for the law does not require the performance of a useless act. The government does not attempt to show that there were arms to meet a requisition had one been made.
The record is replete with testimony showing that there was a great scarcity of arms, and a great demand for them; not only were the agents of the general government in the market bidding for and purchasing them at high prices, but the States were also competing for them, and causing an advance in prices. Independent of any proof on the subject, this fact was so notorious and is of such recent occurrence — is so much a part of our public history — that it is impossible for us to ignore it, which we must do, if we deny that an emergency existed which would make this contract valid.
The authority- of an officer to make a contract under a pressing exigency without inviting competition by public advertisement, has been so fully discussed by the court at the present term, in the case of Ree-side and others, that I shall not now repeat what was then said, but will simply announce that an officer in command may decide as to the existence of an emergency which will excuse the omission to advertise, and act upon his conclusions; and we will uphold his contracts, unless it is shown that the emergency was not real, or that the transaction was not one of good faith and the result of necessity. In the cas.e now under consideration the proof on that head is so full that there is no room for doubt; the purchase is shown to have been necessary and proper, beneficial to the United States, and accepted because it was so.
In reference to the relations of commanding and subaltern officers to the United States and the public, in the matter of contracts, the analogies of the laws applicable to general and special agents will best illustrate our opinion. Ordnance officers, quartermasters, and commissaries of subsistence are special agents authorized to perform specific duties only; a general in command of a department is a general agent, with larger powers and authorized to use discretion in their application. By usage and common understanding, he is empowered to perform all the duties of the special agents, and has direct authority over them; at his bidding they go and come, do and undo. He makes or unmakes, at least for the time being ; nor is it supposed that his pow *102 ers are precisely limited by tbe words of bis commission. His powers are better known by tbe character in which be is held ont to tbe world, which is generally understood to be without much limit as to authority, and its exercise to any needful extent is always sustained. The authority of a general agent as to the public, says Parsons in his work on contracts, “ may be regarded by them as measured by the usual extent of his general employment.” Now what employment of a commander of a department is more general or necessary than that of equipping his soldiers for the field ? If other ways are not provided, the public will and does understand that he may do this by purchase, or in any other proper manner. When a general officer, under such circumstances, makes a beneficial bargain for his government, but of no pecuniary advantage to himself, which is not disavowed within such time as will enable the party bargained with to protect himself, it is quite reasonable that the contract should be enforced.
The third objection to a recovery is, that the claimant has already been sufficiently paid. The contract fixed the price of the carbines; and unless there is evidence to show that the stipulated price greatly exceeded the value of the guns in the market, or that some fraud was practised in the sale of them, it is difficult to perceive why a less sum than that agreed to be paid should be accepted in satisfaction. We do not find any such proof. William W. Marston, who says he has been for the past twenty years engaged in the business of manufacturing arms, sometimes employing as many as two hundred and fifty men for that purpose, states that he rifled four' thousand of these carbines for claimant, in August and September, 1861; that the work was well and faithfully done; that after the alterations in them were made, he considered them a very good and effective weapon for military purposes. He also says he was at the same period engaged in manufacturing arms for the United States government, and that he afterwards assisted in inspecting sixty thousand arms at the instance of the United States, which they had recently imported from Europe. This witness, whose competency to speak on the subject is thus stated, says, “ this lot of Hall’s carbines, being new, improved and effective, were well worth in the month of August, 1861, about twenty-two dollars eáeh ; and that he was well acquainted with the state of the market for fire-arms at that time.” The statements of this witness are fully corroborated by others who are quite as well qualified to judge, and as well informed.
This record abounds in evidence showing that the carbines were of good quality, that twenty-two dollars each was a fair market price for *103 them, and that there was a great demand for and a great scarcity of fire-arms in the market.
On the 10th of September, 1861, Captain F. D. Callender, who signs himself of the Ordnance Department, paid for twenty-five hundred of the carbines at the contract price. Up to this time no objection appears to have been taken to the price agreed to be paid, and to this extent the contract was recognized and approved. The voucher for the second lot of twenty-five hundred of these arms, with packing-boxes, &c., amounting to #58,175, was not paid on presentation, hut the War Department promised “ from time to time to pay, and then totally refused to do so.” The reason for refusing to pay is not given.
On the 13th of March, 1862, the Secretary of War, of his own motion, appointed commissioners to inquire into, audit, and adjust all contracts, orders, and claims on the War Department for arms, &e. These commissioners assumed jurisdiction of this claim without the consent of any person interested in it, except the United States, and reported that a sum of about eleven thousand dollars should he paid in satisfaction of the voucher given for #58,175. This report was not accepted on the part of the claimant, but, on the contrary, he-repudiated the entire proceeding. This unilateral action of the Secretary of War is not obligatory.upon the claimant, and he should nevertheless recover the full amount of his voucher.
A judgment will be rendered the claimant for the sum of $58,175.
Doring, J., dissented.